IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 CR 103 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| CORNELIUS PAXTON, RANDY WALKER, | ) | |
| RANDY PAXTON, ADONIS BERRY, | ) | |
| AND MATTHEW WEBSTER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Cornelius Paxton has filed a motion for discovery related to the policies and practices of the government and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in pursuing so-called "phony stash house" cases.[1] Co-defendants Randy Walker, Randy Paxton, Adonis Berry, and Matthew Webster join his motion. For the reasons stated below, the court grants defendants' motion for discovery.

## BACKGROUND

On February 28, 2013, a grand jury returned a six-count indictment charging Cornelius Paxton and his four co-defendants with conspiring and attempting to knowingly and intentionally possess five kilograms or more of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846; interference with commerce by use of threats, in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and 18 U.S.C. § 2; and knowingly possessing a firearm in furtherance of a drug trafficking crime and a crime of violence, in violation of 21 U.S.C. § 846, 18 U.S.C. § 1951(a), and 18 U.S.C. § 924(c)(1)(A), (2). Randy Paxton was also charged with possession of a

---

[1]Defendants refer to these cases as "phony stash house ripoff cases."

firearm after having been previously convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g) and 924(e)(1).

Defendants were arrested by ATF agents on January 30, 2013, as part of an alleged phony stash house robbery sting operation. The details of these operations are well-known to the courts in this district. In general, an ATF informant or undercover agent poses as an individual with knowledge of the location of a drug stash house. The undercover then offers a defendant the opportunity to rob that stash house,[2] which is usually described as holding a mandatory minimum-triggering quantity of drugs, cash and, potentially, firearms. The undercover then encourages the defendant to recruit friends to assist in the robbery and often suggests that the group bring multiple firearms. Once plans are made and the individuals set off to rob the fictitious stash house, the ATF swoops in and arrests the defendants.

Defendants seek discovery to support anticipated claims of racial profiling in the investigation and prosecution of stash house robbery cases. The government opposes defendants' request. To obtain such discovery, United States v. Armstrong, 517 U.S. 456, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996), and its progeny require a defendant to make a preliminary showing of discriminatory effect and discriminatory intent. Defendants offer statistics regarding the racial makeup of the defendants prosecuted in this district for stash house robberies to meet this "some evidence" standard. According to defendants, in the seventeen cases filed since 2006, 42 of the 57 defendants are African-American, 8 are Latino, and 7 are white. In the cases

---

[2]In the instant case, the government claims that Cornelius Paxton approached the confidential informant about potential opportunities for robberies. Neither side argues that this allegation alters the Armstrong analysis discussed below.

2

filed since 2011, defendants allege that 19 of the 26 defendants are African-American, 7 are Latino, and none are white.

Defendants argue that this statistical information, in the context of phony stash house sting operations, meets the Armstrong standard, and request the following discovery:

> a) A list by case name, number, and the race of each defendant of all phony stash house ripoff cases brought by the U.S. Attorney's Office for the Northern District of Illinois in which ATF was the federal investigatory agency from 2006 to the present [].³
>
> b) For each such case listed in response to a, a statement of prior criminal contact that the federal agency responsible for the investigation had with each defendant prior to initiating the phony stash house ripoff sting (if all such information for a particular case is contained in the criminal complaint, a reference to the complaint would be a sufficient response).
>
> c) The statutory or regulatory authority for ATF to be instigating and/or pursuing phony staff [sic] house ripoff cases involving illegal drugs (i.e. heroin, cocaine, crack, ecstasy, methamphetamine, etc) or any decision by any federal agency, the Justice Department or the White House to authorize ATF to pursue such cases in the Northern District of Illinois.
>
> d) All national and Chicago Field Office ATF manuals, circulars, field notes, correspondence or any other material which discuss "stings", "reverse stings", "phony stash house ripoffs" or entrapment operations, including protocols and/or directions to agents and to confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave before an arrest can be made and how to ensure that agents are not targeting persons for such operations on the basis of their race, color, ancestry or national origin.
>
> e) All documents that contain information on how supervisors and managers of the Chicago area ATF were to ensure and/or did ensure or check to decide that its agents were not targeting persons on the basis of their race, color, ancestry or national origin for these phony stash house ripoffs and what actions the Chicago area ATF (i.e. operating in the Northern District of Illinois) supervisors and

---

³The court notes that the government has already provided to the court and defense counsel a list of currently pending stash house cases in the district.

managers took to determine whether agents were not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

f) The number of confidential informants that the Chicago area ATF has used each year from 2006 to the present and the number of those confidential informants who had access to non-African American or persons of non-African descent who could be targeted for a phony stash house ripoff.

g) The factual basis in each case cited in [the list of cases provided by defendants] and cases produced in response to above and cases [the government produces in response to part a] regarding decisions made to pursue or initiate an investigation against any of the individuals listed as defendants in these cases.

h) All documents containing instructions given during the time Patrick Fitzgerald or Gary Shapiro have been the U.S. Attorney for the Northern District of Illinois about the responsibilities of AUSA's [sic] to ensure that defendants in cases brought by the Office of the U.S. Attorney for the Northern District of Illinois have not been targeted due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which ATF was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry, or national origin.

i) All documents that contain information about all actions taken during the time Patrick Fitzgerald or Gary Shapiro has been the U.S. Attorney for the Northern District of Illinois about the responsibilities of AUSA's [sic] to ensure and/or check to determine that defendants in cases brought by the Office of the U.S. Attorney for the Northern District of Illinois have not been targeted due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which ATF was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendants' race, color, ancestry or national origin.

## **DISCUSSION**

Defendants seek discovery regarding the ATF's investigation of phony stash house robberies and the government's subsequent prosecution of these inchoate crimes. The only question before the court is whether defendants have successfully tendered "some evidence" tending to show that the government and its agents have acted with discriminatory effect and

4

intent, as required by Armstrong.[4] The court therefore makes no comment about the propriety of these kinds of sting operations, or about the merits of defendants' selective prosecution claim.

As the government points out, "[t]he presumption of regularity supports" the government's prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Armstrong, 517 U.S. 456, 464, 116 S. Ct. 1480, 1486, 134 L. Ed. 2d 687 (1996) (internal quotations and citation omitted). Prosecutorial discretion, however, is constrained by the Constitution. Under the equal protection component of the Due Process Clause of the Fifth Amendment, the government may not base prosecutorial decisions on "an unjustifiable standard such as race, religion, or other arbitrary classification," Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L. Ed. 2d 446 (1962).

Armstrong set forth the criteria for obtaining discovery on selective prosecutions claims. In that case, African-American defendants alleged that they were being targeted for federal prosecution for crimes involving crack cocaine, and therefore being exposed to higher statutory and Guideline sentences, instead of being prosecuted in the state system, where the penalties were less severe. In support of their claim, the defendants submitted an affidavit from a paralegal at the Office of the Federal Public Defender that stated that in every one of the 24 crack cocaine cases closed by the office during 1991, the defendant was African-American. The Supreme Court ruled that this statistical showing did not meet the "some evidence" threshold and

---

[4] Defendants' racial profiling claim is essentially a selective enforcement claim, instead of a selective prosecution claim. The two claims are, however, analyzed under the same standard. United States v. Barlow, 310 F.3d 1007, 1010 (7th Cir. 2002) ("[A] defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection standards' that Armstrong outlines for selective prosecution claims.").

reversed the district court's order granting discovery. The Court held that in order for a defendant to meet the "some evidence" standard under the discriminatory effect prong, the defendant must demonstrate that similarly situated individuals could have been prosecuted for the same crime but were not so charged. Although the Court recognized the burden this standard placed on defendants, it explicitly noted that "[t]he similarly situated requirement does not make a selective-prosecution claim impossible to prove." Armstrong, 517 U.S. at 466. The Court suggested that the defendants "could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court." Id. at 470.[5]

The government argues that defendants have failed to identify similarly situated individuals of a different race who were not prosecuted, and faults the defense's assertion that the entire adult white population of the Northern District of Illinois is the appropriate comparison group. The government also argues that the defense's statistics are not compelling because non-African-American defendants were charged in roughly thirty percent of the stash-house cases identified. In response, the defense argues that Armstrong is distinguishable for two reasons. First, the defense notes that no identifiable comparison group exists in phony stash house cases where the government targets the individuals to charge. Second, in Armstrong, the

---

[5]See also, id. at 476 (Breyer, J., concurring) ("Were the selective prosecution defense valid in this case—*i.e.,* were there clear evidence, that the Federal Government's prosecutorial policy had a discriminatory effect and ... was motivated by a discriminatory purpose, it should have been fairly easy for the defendants to find, not only instances in which the Federal Government prosecuted African-Americans, but also some instances in which the Federal Government did not prosecute similarly situated caucasians. The defendants' failure to do so, for the reasons the Court sets forth, amounts to a failure to make the necessary threshold showing in respect to materiality.") (internal quotations and citations omitted).

government provided the selection criteria to the defense in response to the selective prosecution charge, which allowed the defense the opportunity to attempt to identify similarly situated individuals. In the instant case, the government has refused to provide any guidance as to selection criteria.

The court agrees that Armstrong presents a significant challenge for defendants, but one that the Seventh Circuit has addressed to accommodate selective enforcement and racial profiling claims. Inherent in the Armstrong framework is the assumption that there is a defined class of individuals to whom defendants may compare themselves. As the Armstrong court observed, in selective prosecution claims, there should exist records of individuals who were charged and then subsequently treated in a different manner than the defendant. In selective enforcement cases, however, identifying the class of individuals is a much more burdensome endeavor, and one that may prove insurmountable. In Chavez v. Illinois State Police, 251 F.3d 612, 640 (7th Cir. 2001), the Seventh Circuit pointed out the differences between selective prosecution and selective enforcement cases, noting the difficulties defendants in racial profiling actions face. The court observed that "in a meritorious selective prosecution claim, a criminal defendant would be able to name others arrested for the same offense who were not prosecuted by the arresting law enforcement agency; conversely, plaintiffs who allege that they were stopped due to racial profiling would not, barring some type of test operation, be able to provide the names of other similarly situated motorists who were not stopped." Id.[6] The court therefore

---

[6] Chavez involved a civil rights racial profiling claim, and the Seventh Circuit explicitly distinguished Armstrong both because it was a criminal case and because it involved selective prosecution instead of selective enforcement. Yet, the Chavez court explicitly noted that the case before it implicated police conduct and not prosecutorial decision-making, and that this fact
(continued...)

concluded that "[w]hile it is true that statistics alone rarely state a violation of equal protection . . . they can be sufficient to establish discriminatory effect." Id.

The Seventh Circuit subsequently noted that, in some cases, statistics alone may be sufficient to meet the "some evidence" standard for the discriminatory effect prong. United States v. Barlow, 310 F.3d 1007, 1011 (7th Cir. 2002) ("[A]lthough statistics alone rarely establish an equal protection violation, they may be sufficient to establish the discriminatory effect prong of the Armstrong test.") (internal quotations and citation omitted). The court warned, however, that "such statistics must be relevant and reliable." Id. In Barlow, the defendants attempted to conduct a study to ascertain the enforcement practices of Drug Enforcement Administration agents. The study relied on incidents where other law enforcement officers approached African-American individuals, and the court therefore found the study irrelevant to the question of the practices of the DEA. The Seventh Circuit also found the methodology of the survey to be flawed.

In the instant case, there is no defined pool of individuals who are charged and subsequently prosecuted differently to whom defendants may compare themselves. It also appears impossible that defendants would be able to conduct some sort of test operation alluded to in Chavez to determine the practices of the ATF; to produce an analogous situation, the defense would have to encourage Caucasian individuals to identify and approach undercover ATF agents or confidential informants, or somehow gain knowledge of Caucasian individuals

---

(...continued)
was the specific basis for distinguishing Armstrong. Id. Because the instant case likewise involves law enforcement conduct, and not prosecutorial discretion, the court finds the Seventh Circuit's reasoning applicable.

who the ATF was already attempting to target. Because the analogous crime of "phony stash house ripoffs" is wholly dependant on the involvement of the ATF, defendants cannot generate information about similarly situated Caucasian individuals.[7] Defendants are therefore left with the methods described in Chavez and Barlow; they must provide "relevant and reliable" statistical evidence of discriminatory effect.

The court finds that defendants have proffered statistics sufficient to meet the "some evidence" requirement under Seventh Circuit precedent. Unlike the statistics offered in Barlow, defendants have provided statistics relevant to the issue of selective enforcement by the ATF. All of the cases identified by defendants have involved undercover operations by ATF agents in circumstances largely similar to the instant case. Further, the statistics appear to be reliable because they are corroborated, in part, by the lists of cases provided by the government, and there is no assertion that the information collected by defendants as to race is inaccurate.[8] Under the unique circumstances of this case, the court finds that defendants have produced evidence sufficient to meet the Armstrong standard for discriminatory effect.

Additionally, the court notes that in at least one other case in this district, U.S. v. Brown, 12-CR-0632 (N.D. Ill. filed Sept. 13, 2012), the government appears to have complied with the

---

[7]The court also notes that, absent selection criteria similar to what the government provided in Armstrong, defendants may be unable to identify who any "similarly situated" individuals are.

[8]The court takes notice of the fact that defense counsel in these cases are largely Federal Defenders and members of the Criminal Justice Act Panel, and as a result, there is significant overlap between defense counsel in the instant case and defense counsel in the other stash house cases cited in defendants' brief. According to the brief, defense counsel have, in consultation, identified both the cases with similar fact patterns and the race of the defendants in those cases.

district court's order to produce some of the same discovery materials sought in the instant case, although those materials are subject to a protective order. In Armstrong, the court noted that:

> "[i]f discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim. Discovery thus imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy. The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim."

517 U.S. at 468. Because the government has presumably already assembled some of the documents, the costs of producing such discovery in the instant case are somewhat mitigated.

The court also finds that defendants have made a preliminary showing of discriminatory intent. The defense has demonstrated that no white defendants have been indicted for phony stash house cases since 2009, despite the diverse makeup of the Northern District of Illinois. Because "the inexorable zero" may be evidence of discriminatory intent, Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886), the court finds that defendants have produced "some evidence" tending to show discriminatory intent.

The court finds that defendants have met their burden under Armstrong and its progeny, and grants defendants' motion for discovery. Although defendants have made a sufficient showing to entitle them to discovery, the court finds the scope of defendants' request to be broader than necessary. The parties are directed to meet and confer regarding which items on the list may be disclosed by agreement, and to report to the court on May 14, 2014, at 1:30 p.m.

April 17, 2014

Robert W. Gettleman