IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | Case No. 13 CR 0103 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| CORNELIUS PAXTON, RANDY WALKER, ) | |
| RANDY PAXTON, ADONIS BERRY, and ) | |
| MATTHEW WEBSTER, ) | |

# MEMORANDUM OPINION

In the 24 years the undersigned judge has been on the district court bench, this is his first written opinion concerning a sentencing – and he hopes his last. The case is one of many "false stash house cases" that were aptly described in Chief Judge Ruben Castillo's thorough opinion in United States v. Brown, 299 F. Supp. 3d 976 (N.D. Ill. 2018). This court need not elaborate on Judge Castillo's description of the methods employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to entice people, mostly minorities, into conspiring to rob fictitious stash houses of fictitious drugs or money operated by fictitious drug dealers.

The court fully agrees with Judge Castillo's conclusion that these operations "undermine[d] legitimate law enforcement efforts in this country" and have "generate[d] great disrespect" for those efforts, Brown, 299 F. Supp. 3d at 983, as well as the Seventh Circuit's summary of judicial criticism of these cases as "tawdry" and "disreputable." United States v. Conley, 875 F.3d 391, 402-403 (7th Cir. 2017). I join Judge Castillo's call to end these stash house cases and "relegate[] [them] to the dark corridors of our past." Brown, 299 F. Supp. 3d at 983–84. I do so because "the potential for abuse and mischief that is endemic to fictitious stash-

house stings should not be ignored." United States v. Washington, 869 F. 3d 193, 223 (3d Cir. 2017) (McKee, J. concurring in part and dissenting in part).

Judge Castillo's opinion was written within the context of a motion to dismiss the indictments in that case and eleven others after extensive discovery, expert analysis and a unique hearing before the nine judges from this district who had false stash house cases on their calendars. Although Judge Castillo "reluctantly" denied the motions to dismiss his cases, he strongly encouraged the government to bring these cases, some of which had been pending for more than six years, to a satisfactory conclusion. Heeding that sound advice, the United States Attorney offered all defendants, whose charges included many offenses that carried long mandatory minimum sentences as well as high Guideline offense levels, the opportunity to plead to a single count of conspiracy to commit robbery affecting commerce, in violation of 18 U.S.C. § 1951(a).

The five defendants whose cases are pending in this court accepted the plea deal and are now facing sentencing. Unlike many of the defendants in some of the other cases, these defendants have been on bond since at or around the time of their arrest on January 31, 2013, and with some relatively minor exceptions have complied with the terms of their bonds.[1] The instant case involves five men, all African-American, who range in age from 40 to 55. All are employed and, while most have had criminal convictions in their past (most many years ago), none have serious or violent criminal histories. Three of the five defendants have criminal history levels of I, and two have criminal history levels of II. The defendants in this case, like

---

[1] The court revoked the bond of one defendant for drug use for a six-and-a-half-month period. That defendant is currently in a drug rehabilitation program and has been compliant.

so many other stash house defendants, are "people who but for the government's scheme might not have ever entered the world of major felonies." United States v. Black, 750 F.3d 1053, 1057–58 (9th Cir. 2014) (Reinhardt, J., dissenting from denial of rehearing en banc). Indeed, their minimal criminal histories suggests that they would not have.

Following the false stash house script, a confidential informant ("CI") contacted Cornelius Paxton ("Cornelius") in November 2012, informing Cornelius that he was considering arranging the robbery of a cocaine supplier who was associated with a Mexican drug cartel. Cornelius rose to the bait, and over a two-day period on January 30 and 31, 2013, recruited four relatives and friends to form a "crew" to rob, not the stash house itself, but the CI. One of the defendants acquired a pistol that the CI was to conceal in a compartment in one of the vehicles to be used in robbing the non-existent stash house. On the day of the fictitious heist, all five defendants were arrested and held for approximately five days before being released on bond.

There is nothing in the record to indicate that Cornelius was in the business, or had any prior experience, of robbing stash houses or drug dealers, or any arrests or convictions for drug dealing at all. According to the government, he was targeted because an unidentified informant told an ATF agent that Cornelius used to sell cocaine and marijuana. After that, the ATF received information, again derived from anonymous sources, that Cornelius was rumored to have led an armed crew in robbing a U-Haul truck carrying marijuana. He was never charged with, much less convicted of, any of these crimes. In fact, in 2012 Cornelius had been selling cars for four years and stopped only when he was arrested in this case. The other participants Cornelius recruited were likewise unlikely stash house robbers and were unknown to ATF before January 31, 2013.

As the government explained in connection with the proceedings concerning the motion to dismiss the indictments, the false stash house cases began with the laudable goal of prosecuting actual stash house robberies (which often involve violence and the use of firearms) and potential such robberies. The initial targets were carefully chosen as likely to or planning to commit these crimes. Eventually, however, ATF began "trolling for targets" in communities "defined only by economic and social conditions," enticing people who were desperate and foolish enough to take the bait of easy money by committing a crime that was unlikely to be reported because the victims were themselves engaging in drug trafficking. United States v. Black, 733 F.3d 294, 303 (9th Cir. 2012). As a result, "the tired sting operation seems to be [often] directed at unsophisticated, and perhaps desperate, defendants . . .." United States v. Lewis, 641 F.3d 773, 777 (7th Cir. 2011). That, sadly, is what occurred in the instant case.

Conspiracy to commit a criminal act is a crime even if that act never occurs or even if it was fictitious. United States v. Whitfield, 649 F. App'x 192, 195 (3d Cir. 2016), cert. denied, 137 S. Ct. 1063, 197 L. Ed. 2d 186 (2017). Many dangerous criminals have been successfully prosecuted using this effective law enforcement tool, and the court commends the U.S. Attorney's Office for recognizing the limitations of that tool in the cases brought in this district. The use of a firearm in connection with the conspiracy adds a serious aggravating factor in such cases. There is no need to elaborate on the tragic consequences of gun violence in this and other communities. As with most conspiracies, each defendant in this case occupies a unique place and will be sentenced accordingly.

The purpose of this opinion is to express this court's disgust with the ATF's conduct in this case. These defendants were not known drug traffickers or active gang members. They

were all employed, have families and strong ties to the community. None of them have histories of violent conduct, and they are all in their 40s except for one, who is 55 years-old. There is no question in this court's mind that none of these defendants would have even thought of engaging in a stash house robbery – or any such criminal activity – were it not for ATF's scheme to entice them to do so. This court, like many before it, "question[s] the wisdom and purpose of expending the level of law enforcement resources and judicial time and effort in this prosecution." Conley, 875 F.3d at 403 (internal quotation omitted).

In sentencing any defendant, one of the primary purposes of the governing statute is to "promote respect for the law." 18 U.S.C. § 3553(a). Respect for the law begins with respect for the people and institutions that are sworn to enforce and protect the law. In fashioning the sentences for each of the defendants in this case, this court will be most mindful of that directive.

**ENTER:** September 20, 2018

_____
Robert W. Gettleman
United States District Judge